## CIRCUIT COURT OF ESSEX COUNTY

Myrtle M. Holland Kelsoe

v.

Darrell W. Kelsoe

### Case No. CH96001943

BY JUDGE HARRY T. TALIAFERRO, III

### July 16, 2003

The parties by leave of court filed in December 2002, a Second Amended Answer and Cross-Bill and an Answer to Second Amended Cross-Bill. These amended pleadings were filed during the pendency of Ms. Kelsoe's Plea in Bar and Motion for Summary Judgment pursuant to Rule 2:21.

Rule 2:21 states as follows:

> Except in a suit for divorce or for the annulment of marriage, either party may make a motion for summary judgment at any time after the parties are at issue. If it appears from the pleadings, the orders, if any, made at a pretrial conference, the admissions, if any, in the proceedings, or, upon sustaining a motion to strike the evidence, that the moving party is entitled to judgment, the court shall enter judgment in his favor. Summary judgment, interlocutory in nature, may be entered as to the undisputed portion of a contested claim or on the issue of liability alone although there is a genuine issue as to the amount of damages. Summary judgment shall not be entered if any material fact is genuinely in dispute. No motion for summary judgment or to strike the evidence shall be sustained when based in whole or in part upon any discovery deposition under Rule 4:5, unless all parties to the action shall agree that such deposition may be so used.

Ms. Kelsoe seeks dismissal of Mr. Kelsoe's Second Amended Cross-Bill filed December 17, 2002. The purpose of this letter is to rule on such Plea and Motion.

## Prior Proceedings

The original Bill of Complaint for a divorce was filed by Ms. Kelsoe on March 7, 1996. Before it was served, the Court granted Ms. Kelsoe leave to file an Amended Bill of Complaint. Thereafter, Mr. Kelsoe filed his initial Answer and Cross-Bill on April 23, 1996.

This case has proceeded by fits and starts. A number of counsel have come and gone. Ms. Kelsoe filed a Plea in Bar (the Plea in Bar arises from affirmative defenses set out in an Amended Answer to Cross-Bill filed on April 26, 1999, and again on June 23, 1999) asserting that Mr. Kelsoe's Cross-Bill to the extent it relates to real estate or a contract in consideration of marriage was barred by the Statute of Frauds and that Mr. Kelsoe's Cross-Bill was barred by the Statute of Limitations. On August 11, 1999, the Court heard argument on the Plea in Bar. The Court did not rule on such plea, but rather by Order entered on October 7, 1999, referring the Plea in Bar to William Reilly Marchant, a Commissioner in Chancery, for determination. By a Decree of Reference entered April 28, 1999, the Court appointed William Reilly Marchant, a Commissioner in Chancery in the City of Richmond, to inquire and hear evidence on equitable distribution and report to the Court his findings and recommendations. No equitable distribution hearing took place, and Mr. Marchant returned his fee advances to the parties on January 24, 2001, because the case was "no longer moving forward." The Commissioner was directed pursuant to the Order to prepare and file an Interim Report for the Court on the Plea. The Report was filed with the Court on September 27, 1999. In a timely manner, Ms. Kelsoe filed exceptions to the Interim Report pursuant to § 8.01-615. No exceptions were filed by Mr. Kelsoe. No order relating to the Interim Report and the exceptions taken thereto has ever been entered.

Nothing happened in the case for several more years until, following his appearance as counsel for Ms. Kelsoe, Mr. Bugg filed a Motion for Summary Judgment on July 12, 2002, on behalf of Ms. Kelsoe pursuant to Rule 2:21. Mr. Batzli also made an appearance as counsel for Ms. Kelsoe. The Motion for Summary Judgment, in part, tracks the Plea in Bar. In hearings on August 19, 2002, and on November 15, 2002, the Court heard the *ore tenus* testimony of William Cullum, Ms. Kelsoe, and Mr. Kelsoe, and arguments of counsel. A number of briefs have been filed wherein both counsel have relied significantly upon the transcript of the Commissioner's hearing and the Commissioner's Interim Report. Since both parties have cited and argued the transcript of the Commissioner's hearing, the Interim Report, and the exceptions to the report, the Court shall consider these

materials along with the other evidence in its ruling on the Plea in Bar and the Motion for Summary Judgment.

Section 8.01-610, Code of Virginia, provides that the report of a Commissioner in Chancery shall not have the weight given to the verdict of a jury on conflicting evidence, but the Court shall confirm or reject such report in whole or in part, according to the view which it entertains of the law and the evidence. Case law has interpreted the statute to mean that the trial Court should sustain the Commissioner's Report unless the Court concludes that the Commissioner's findings are not supported by the evidence. This rule particularly applies to a Commissioner's findings of fact based upon evidence taken in his presence, but is not applicable to pure conclusions of law contained in his report. *Hill v. Hill*, 227 Va. 569, 318 S.E.2d 292 (1984); *Dodge v. Dodge*, 2 Va. App. 238, 348 S.E.2d 363 (1986).

### Motion for Summary Judgment; Plea in Bar

Mr. Kelsoe's Second Amended Cross-Bill contains four counts. Based upon consideration of all the foregoing, the Court rules on Ms. Kelsoe's Motion for Summary Judgment; Plea in Bar as follows.

### Count I: Breach of 1984 Contract

The Commissioner's factual conclusion in the Interim Report was that the defendant himself breached the 1984 oral contract when in March, 1989, he left Virginia and returned to Alabama, as he put it "broke and heart sick" and, while there, married Deann Merchant, from whom he was divorced in April 1992, and was employed in the State of Alabama by Demar Timber. The Commissioner further found that Mr. Kelsoe's claims that Ms. Kelsoe breached the alleged 1986 oral agreement and that she committed fraud with respect to such contract were barred by the applicable Statutes of Limitation. The Commissioner used this latter date to afford maximum benefit to Mr. Kelsoe regarding which year the contract began. Since the Commissioner based his findings upon the testimony of the defendant himself given under oath before the Commissioner, we take Mr. Kelsoe's own statements to be admissions sufficient to grant either the Plea in Bar or the Motion for Summary Judgment as to Count I of the defendant's Cross-Bill. Count I of the Second Amended Cross-Bill filed December 17, 2002, is identical to Mr. Kelsoe's original Cross-Bill filed April 23, 1996. Ms. Kelsoe asserted the Statute of Limitations as to the 1984 contract both in her Plea in Bar and Motion for Summary Judgment. We agree with the Commissioner that the defendant's Cross-Bill's claims of breach of the oral 1984 contract and the fraud claim related thereto are barred by the applicable Statutes of Limitation.

*Count II: Breach of 1994 Contract*

The Court finds that the original Cross-Bill alleges one oral contract made in 1985. The Commissioner's Interim Report stated that Mr. Kelsoe's amended Cross-Bill appeared to allege a single contract, but noted evidence was heard regarding what Mr. Kelsoe described in his own Memorandum as a "second subsequent oral contract" based upon the consideration of marriage. Rule 1:4(d) requires that "[e]very pleading shall state the facts on which the party relies . . . and . . . it shall be sufficient if it clearly informs the opposite party of the true nature of the claim . . . . " The Court cannot find an allegation or prayer for relief in the original Cross-Bill of a 1994 contract based upon the consideration of marriage. The two Affidavits (both executed in 1996) filed with the original Cross-Bill were not referred to in Mr. Kelsoe's original pleadings and, therefore, under Rule 1:4(i) are not part of the pleadings. The affidavits did serve, however, as notice of alleged statements by Ms. Kelsoe that she would transfer one-third of her estate to Mr. Kelsoe upon or after their marriage, which occurred on February 1, 1994. Ms. Kelsoe objected in her memorandum and at the Commissioner's hearing to the variance between the evidence and the allegations with respect to the claim of any contract in consideration of marriage.

The Commissioner's Interim Report discusses § 8.01-377 which, in applicable part, states that "if, at the trial of any action, there appears to be a variance between the evidence and the allegations or recitals, the Court, if it considers that substantial justice will be promoted and that the opposite party cannot be prejudiced thereby, may allow the pleadings to be amended, on such terms as to the payment of costs or postponement of the trial, or both, as it may deem reasonable."

The Court agrees that this Statute is remedial in purpose and is to be liberally construed. It is appropriately utilized where the evidence heard by the Commissioner makes it apparent that both parties were aware of a supposed second oral contract and that neither surprise nor prejudice was a factor in the taking of evidence. The Commissioner assumed, without deciding, that the 1994 contract would be deemed by the Court to be properly before the Court.

The authority for the Court's allowing amendments to pleadings is also set forth in Rule 1:8 which states, echoing § 8.01-377, that "leave to amend shall be liberally granted in furtherance of the ends of justice." Ms. Kelsoe, in her own brief, does not assert surprise. Overruling any objection by Ms. Kelsoe of variance between the allegations and the evidence, the Court, citing Rule 1:8, granted Mr. Kelsoe leave to amend his Cross-Bill by Order entered on December 17, 2002, finding that such amendment was for good cause shown and without prejudice to any party.

In Count II of the Amended Cross-Bill filed December 17, 2002, Mr. Kelsoe satisfied Rule 1:4(d) by clearly pleading the 1994 contract cause of

action based on the consideration of marriage. It was then that the alleged 1994 oral contract was brought properly before the Court.

Ms. Kelsoe's Motion for Summary Judgment seeks dismissal of the 1994 oral contract cause of action on the grounds that it is time barred. The Motion requires interpretation of § 8.01-6.1 which allows under certain circumstances an amendment of pleading adding a claim to relate back to the date of the original pleadings for purposes of the Statute of Limitations. An added claim "relates back" under § 8.01-6.1 "if the Court finds (i) the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth in the original pleading, (ii) the amended party was reasonably diligent in asserting the amended claim or defense, and (iii) parties opposing the amendment will not be substantially prejudiced in litigating on the merits as a result of the timing of the amendment." Ms. Kelsoe argues that this code section is inapplicable to this case. The Commissioner did not discuss it in his Interim Report.

The Court has already found that the claims under Count I: Breach of 1984 Contract are extinguished and that no contract upon consideration of marriage was alleged in the original Cross-Bill. Mr. Kelsoe, in paragraph 11 of Count II, realleges and incorporates all allegations in Count I. This incorporation by reference causes contradictory allegations within Count II.

Paragraph 6 of Count I incorporated into Count II alleges that "*as an expression of her satisfaction and approval* of Mr. Kelsoe's conduct toward her and on her behalf for more than nine years, plaintiff pleaded with defendant to marry her and February 1, 1994, the parties were married." (Emphasis added.) Paragraph 12 of Count II alleges that Ms. Kelsoe promised to transfer one-third of her estate to Mr. Kelsoe "*as an inducement for defendant to marry plaintiff.*" (Emphasis added.) Which was it, an expression of satisfaction for what had already been promised and performed or an inducement to marry her in consideration for which Ms. Kelsoe would convey one-third of her estate? Counsel may file contradictory claims in different counts, but cannot do so in the same count.

The date of the promise to marry is not specifically alleged, although the Gavin and Robohm affidavits incorporated by reference under paragraph 12 of Count II place Ms. Kelsoe's statements in the 1993 to 1994 time frame. The Commissioner's Report states that Mr. Kelsoe in his own Memorandum stated that the parties entered into "a separate subsequent oral contract when the wife promised to convey one-third of her estate to husband if he would marry her, continue to manage her business affairs, and forego all other business opportunities."

We find that the alleged Count II Breach of 1994 Contract claim does not arise out of the conduct, transaction, or occurrence alleged in Count I, which is identical to the original Cross-Bill filed April 23, 1996. The latter contract is based upon a new consideration of marriage, while the 1984 contract was not.

We find that the Count II claim does not relate back to the original conduct, transaction, or occurrence set forth in the original pleadings for the purposes of the Statute of Limitations. Mr. Kelsoe did return to Virginia and marry Ms. Kelsoe on February 1, 1994. The 1994 oral contract would certainly have been breached by Ms. Kelsoe when Ms. Kelsoe filed her divorce suit on March 7, 1996, prompting Mr. Kelsoe to file on April 23, 1996, his Answer and Cross-Bill which Ms. Kelsoe denied in its totality in her Answer to Cross-Bill filed on May 9, 1996, and in all her subsequent pleadings. The three year Statute of Limitations on breach of an oral contract would have begun running at that time. Mr. Kelsoe did not plead the 1994 contract until December 17, 2002. We find that the claims based on the 1994 contract were barred by the applicable Statutes of Limitation at the time Count II was filed. We also find that the over six and one-half year delay in filing the claim does not constitute reasonable diligence on the part of Mr. Kelsoe in asserting his amended claim. We find under the circumstances of this case that Mr. Kelsoe's claim under Count II is barred by the Statute of Limitations and by Mr. Kelsoe's lack of due diligence.

### Count III: Breach of 1999 Settlement Agreement

In this count, Mr. Kelsoe asserts a never before pleaded allegation that he and Ms. Kelsoe by themselves without assistance of counsel entered into a written 1999 settlement contract of all claims arising out of their relationship. There are material issues of fact to be resolved with respect to this count. There appears to be a typographical error in the dates alleged in paragraphs 18 and 19. Assuming the written document dated February 1, 1998, is produced or otherwise found by competent evidence to exist and its terms precisely established, the claim would not be barred by the five year Statute of Limitations for enforcement of written contracts. The "relation back" rule is inapplicable here. The Court declines to dismiss this Count.

The Court, however, grants Ms. Kelsoe's Motion Craving Oyer. Mr. Kelsoe shall produce the original written contract for inspection by Ms. Kelsoe's counsel and the Court within sixty days of the entry of the Order setting forth the ruling contained in this letter.

### Count IV: Fraud

Mr. Kelsoe asserts in this Count a never before pleaded allegation of fraud relating to the 1994 contract. We have already found that the 1994 contract does not "relate back" under § 8.01-6.1 to the conduct, transaction, or occurrence set forth in the original pleading because it is a second subsequent contract based on the new consideration of marriage. Mr. Kelsoe certainly was aware or should have been aware of this claimed fraud in 1996 when Ms. Kelsoe sued him for divorce and pleaded a complete denial of his original Cross-Bill. This claim of fraud was not pleaded until

December 17, 2002. The two year Statute of Limitation on a fraud claim would have run by 1998. Also, any "relate back" claim would be barred by Mr. Kelsoe's lack of due diligence in delaying another four years to assert this claim. Mr. Kelsoe's claim under Count IV is barred by the Statute of Limitation and by his own lack of due diligence.

## Summary

(1) Ms. Kelsoe's Plea in Bar and Motion for Summary Judgment as to Count I of Mr. Kelsoe's Second Amended Cross-Bill are granted. Count I is dismissed.

(2) Ms. Kelsoe's Motion for Summary Judgment as to Count II of Mr. Kelsoe's Second Amended Cross-Bill is granted. Count II is dismissed.

(3) Mr. Kelsoe's Count III claim of a written 1999 contract raises material issues of fact genuinely in dispute between the parties. Count III is not dismissed and is reserved for hearing.

(4) Ms. Kelsoe's Motion Craving Oyer is granted. Mr. Kelsoe shall produce the original written contract referred to in Count III within sixty days of the entry of the Order setting forth the ruling in this opinion letter.

(5) Ms. Kelsoe's Motion for Summary Judgment as to Count IV of Mr. Kelsoe's Second Amended Cross-Bill is granted. Count IV is dismissed.

October 20, 2003

I am in receipt of Mr. Bugg's letter dated October 7, 2003, which was copied to Mr. Batzli and Ms. Washington. If Mr. Bugg desires to prepare an Order, he may do so, however, I am not comfortable with entering such Order without an opportunity for argument. I would suggest that Mr. Bugg may wish to obtain a date from my legal assistant agreeable to all counsel for the presentment of a Decree after the Notice of same to all counsel of record. This would not prohibit any counsel from filing such additional pleadings as they may deem appropriate.

September 9, 2004

By Order entered August 7, 2003, this Court took under advisement the plaintiff's Plea of Summary Judgment to dismiss Count III of defendant's Second Amended Cross-Bill as barred by the Statute of Limitations and granted plaintiff's motion craving oyer, directing the defendant to produce the written contract alleged in Count III within sixty days. Defendant's Second Amended Cross-Bill containing Count III was filed on December 17, 2002. At a hearing before this Court on November 24, 2003, the defendant produced a written document dated April 5, 1998. Because of variations between allegations in Count III and provisions in the document produced (which the Court admitted as defendant's exhibit 1), the Court by Order entered December 9, 2003, granted the defendant leave to file a Third

Amended Cross-Bill. Defendant's Third Amended Cross-Bill repleading Count III as Count V was filed on December 9, 2003. On December 22, 2003, the plaintiff filed her answer to defendant's Third Amended Cross-Bill alleging *inter alia* that Count V is barred by the Statute of Limitations.

The Court, for the reasons cited herein, finds that Count V relates back to the conduct, transaction, or occurrence set forth in Count III and, hence, the defendant's claim that Count V is barred by the statute of limitations is denied. Whether Count V is barred by lack of defendant's reasonable diligence is reserved for the Court's later determination.

### Prior Proceedings and Brief Recitation of Facts

This Circuit Court proceeding between Ms. Kelsoe (now Ms. Holland) and Mr. Kelsoe began on March 7, 1996. Reference is made to this Court's opinion letter dated July 16, 2003, for a more complete background of these proceedings.

Count III in essence alleged that on or about February 1, 1998, the parties entered into and signed a written agreement settling all their pending litigation. There was reference in Count III to the document being dated 1999, but Count III also alleged that the document was made just prior to a February 2, 1998, court hearing. In defendant's discovery responses and in other prior proceedings, the date was consistently referred to as 1998. The alleged terms of the agreement were that the parties would remain married, the defendant would receive as his sole and separate property the following: 91 acres and 10 acres held in the name Rose Garden Farms, property in Alabama also in the name of Rose Garden Farms, the plaintiff's interest in a promissory note made by Bill Cullum as well as the residence of Bill Cullum, and the sum of $500,000. Also, it was alleged that the agreement provided for the placement of 1/3 of plaintiff's estate in an irrevocable trust to become the defendant's sole and separate property upon plaintiff's death. The defendant sought an award of all of the above under Count III.

The alleged written agreement had never been produced by either party, although it was the subject of substantial testimony given at a hearing before W. Reilly Marchant, Commissioner in Chancery, at a hearing which took place on August 25-26, 1999, and answers to interrogatories filed by the plaintiff. According to the testimony and representations of the defendant, the writing constituting such agreement was not located until November 21, 2003, a few days before a scheduled hearing in the Essex County Circuit Court. Part of the Court's scheduled hearing was consideration of the plaintiff's previously granted motion craving oyer of the original written agreement. At the hearing on November 24, 2003, the defendant produced an original written document dated April 5, 1998. Leave was granted the defendant to file a Third Amended Cross-Bill for the purpose of amending the allegations in Count III to reflect the wording of the document.

The plaintiff argues that Counts III and V constitute substantially different causes of action and that Count V consequently does not relate back to Count III for the purposes of § 8.01-6.1. Plaintiff argues among other things the following facts as evidence that Count III and Count V are different causes of action and that the defendant failed to exercise reasonable diligence in asserting the 1998 written agreement claim:

(1) That Count III alleged the date of the agreement to be on or about February 1, 1998, whereas Count V alleges a document dated April 5, 1998, the date of the document produced;

(2) That although Count III and Count V allege the agreement covered substantially the same assets, Count III alleges that all assets were to be or were to become, the sole and separate property of the defendant. The only exception is the April 5, 1998, document's failure to state anything about one-third of the plaintiff's estate being placed in an irrevocable trust to become defendant's sole and separate property on plaintiff's death. Count V, following the terms of the April 5, 1998, document alleges numerous contingencies about disposition of such assets which would or could result in dispositions other than sole and separate ownership by the defendant;

(3) That Count III alleged defendant was to receive in a trust 1/3 of plaintiff's estate to become defendant's sole and separate property upon plaintiff's death, whereas Count V omits any mention of disposition of 1/3 of plaintiff's estate which corresponds to there being no such provision in the April 5, 1998, document;

(4) That contrary to defendant's earlier claims, the document was not written on tractor fed computer paper, was not solely in the plaintiff's handwriting, and was not last in the possession of the plaintiff because it was found among the defendant's effects;

(5) That "suspicion" surrounding the circumstances of the defendant's failure to produce the original document or a copy thereof until several days before the hearing evidence that the defendant was not making serious efforts to locate the document or to comply with the sixty day deadline for producing it under the Order craving oyer.

### Issues

The first issue before the Court is whether, under Va. Code § 8.01-6.1, Count V "relates back" to the conduct, transaction, or occurrence set forth in Count III, and if not, is Count V barred by the five year Statute of Limitations for enforcement of written contracts.

The second issue is whether Count V is barred by the defendant's lack of reasonable diligence.

*Analysis*

A. *Is Count V Barred by the Statute of Limitations?*

The plaintiff argues that Count V describes an entirely different cause of action from Count III and, therefore, does not relate back for the purpose of the statute of limitations under § 8.01-6.1 and that, because Count V was not filed within five years of the date of breach of the agreement (the failure of the plaintiff to make the first $5,000 interest payment to defendant on May 5, 1998, from the $500,000 Trust), the enforcement of its provisions is barred by the five year statute of limitations on written contracts.

The plaintiff cites *Dillow v. Stafford*, 181 Va. 483, 25 S.E.2d 330 (1943) (substitution of new plaintiff in action on a note held not to change nature or identity of original action, however, amendments not allowed to bring in new substantive cause of action different from that alleged and which plaintiff intended to assert when action instituted); *T. M. Graves Construction, Inc. v. National Cellulose Corp.*, 226 Va. 164, 306 S.E.2d 898 (1983) (judgment on negligent set up of equipment to install insulation not different cause of action from pleaded negligent application of insulation, because "application" of insulation included setting up equipment all as part of a single contract, therefore, unnecessary to separately plead negligent setting up or to amend pleadings); *Ted Lansing Supply Co. v. Royal Aluminum & Construction Corp.*, 221 Va. 1139, 277 S.E.2d 228 (1981) (Defendant moved to strike for failure to prove pleaded breach of expressed warranty, trial court *sua sponte* ruled plaintiff could recover on unpleaded theory of implied warranty; no new or amended pleading filed; Supreme Court reversed, holding no judgment could be had upon facts not alleged or a right not pleaded and claimed); *Bolling v. Acceptance Corp.*, 204 Va. 4, 129 S.E.2d 54 (1963) (Supreme Court reversed verdict based on implied warranty where pleadings asserted only breach of express oral warranty, noting that function of pleading is to inform opposing party of nature of the case against him); *Vines v. Branch*, 244 Va. 185, 418 S.E.2d 890 (1992) (action for trespass to personal property for failure to return a car, on appeal held amended pleading adding claims of breach of oral contract to provide driving lessons asserted new cause of action which was time barred when filed); *Irvine v. Barrett*, 119 Va. 587, 89 S.E. 904 (1916) (in slander suit, successive demurrers were sustained because words initially pleaded were not *per se* actionable, amended action pleaded actionable words only by innuendo which by law also not actionable, plaintiff then pleaded another amended action charging specific actionable words, defendant's Plea of Statute of Limitations and Motion to Set Aside plaintiff's verdict as contrary to law and evidence denied on appeal final pleading ruled time barred because prior demurrable actions do not stay the statute of limitations for purposes of later amended pleadings. Supreme

Court also opined that, if recovery under original complaint would bar a recovery under amended complaint, an amended action pleading a different demand, not pleaded in the original motion for judgment, is a new cause of action which will not relate back to the beginning of the action for purpose of staying the statute of limitations); *Davis v. Marshall Homes, Inc.*, 265 Va. 159, 576 S.E.2d 504 (2003) (claim of fraud in real estate transaction dismissed, plaintiff filed second action on notes made by same defendants, trial court sustained defendant's plea of *res judicata* on ground plaintiff split a single action, reversed on appeal on finding that fraud and breach of contract are different causes of action, for purposes of *res judicata* causes of action must assert particular legal rights arising from a definable factual transaction, held the two causes of action arose from different definable transactions and constituted assertions of different particular legal rights).

Plaintiff's motion to dismiss Count V as barred by the Statute of Limitations is based upon equating Count V to a cause of action entirely different from that alleged in Count III. Section 8.01-6.1 provides that an amendment of a pleading changing or adding a claim against a party relates back to the date of the original pleading for purposes of the Statute of Limitations if the Court finds (i) the claim asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleadings, (ii) the amending party was reasonably diligent in asserting the amended claim, and (iii) the party opposing the amendment will not be substantially prejudiced in litigating on the merits as a result of the timing of the amendment.

Plaintiff argues (omitting the disjunctive words "conduct" or "occurrence"), that, for the purposes of § 8.01-6.1, "transaction" should be deemed the equivalent of "cause of action" as applied in *res judicata* cases. The plaintiff cites *Davis*, which held that a defendant's verdict on a fraud claim (which would have required proof of the six elements of fraud) did not under the doctrine of *res judicata* bar a subsequent action by the plaintiff against the same defendants on their failure to pay mortgage notes, which notes were the basis for the fraud claim.

Plaintiff cites *Davis* for its *res judicata* definition of "cause of action," namely, an assertion of particular legal rights arising out of a definable factual transaction, and for *Davis*'s rejection of a transactional analysis test. For *res judicata* to apply, there must be one case tried and decided then a second action brought containing the necessary particular assertion arising out of the definable factual transaction. The judicial doctrine underlying this rule, to protect parties from harassing successive suits on matters previously litigated or which could have been litigated, simply does not fit the "conduct, transaction, or occurrence" language in § 8.01-6.1 used to determine whether the amended claim arose out of the conduct, transaction, or occurrence set forth in the prior pleading.

Many of plaintiff's cites involve cases where a distinct cause of action is pleaded, but the trial court judgment is entered on a different legal ground not pleaded or which have not even involved an amended pleading. For example, plaintiff cites *Ted Lansing* as a case controlling the contract issue in this case. This suit alleged breach of expressed warranty. When the defendant moved to strike for failure to prove the claim alleged, the trial court *sua sponte* decided the plaintiff could recover on the unpleaded entirely different claim of breach of an implied warranty of fitness. No amendment of pleadings was made, hence "relating back" for the purpose of § 8.01-6.1 was never an issue. This case applies to a factual variation between the pleadings and the judgment after trial, not to amending pleadings before trial, or to the "relating back of the same."

Plaintiff also argues *Vines* and *Irvine*. Analysis of *Irvine*, decided in 1916, requires knowledge of the particular facts of the case. A complaint alleging slander was filed. A demurrer was sustained for failure to state damages. An amended complaint alleging the same slander was filed. A demurrer was sustained for failure to allege *per se* actionable words. Another amended complaint was filed alleging the same words, but pleading such words to be slander by innuendo. A demurrer was sustained because slander by innuendo is not an actionable cause. Another amended complaint alleging a wholly different slander was filed. A demurrer was filed and overruled. The defendant filed a denial answer and a plea to the statute of limitations. There was a plaintiff's verdict, and the defendant's motion to set aside the verdict as contrary to the law and evidence was denied. On appeal, the Supreme Court found that the complaint alleged different slanderous words, "so dissociated from the nonactionable words" previously alleged as to constitute a new cause of action, not spoken on the same occasion, not addressed to the same person, not at the same time or place, and which could not be imputed as an attempt to amplify or to set out the same cause of action phrased differently. *Irvine* held that this wholly new slander claim never pleaded before set out in the last amended complaint did not relate back and was barred by the statute of limitations.

In *Vines*, an action for trespass on personal property was found to be unrelated to a later filed claim of breach of an oral contract to provide driving lessons. The Supreme Court accordingly held there could be no relating back of the added contract action to the original tort action. Since the latter action brought on contract was time barred when filed, the trial court's decision to dismiss the contract claim on the statute of limitations was affirmed.

The plaintiff's lengthy and heavily cited arguments miss one overriding fact which is that Count III and Count V (unlike the totally different slanders alleged in *Irvine* or the totally different claims of tortious trespass to personal property and breach of an oral contract in *Vines* or the tenuous extension of the *Davis res judicata* equivalency of "transaction"

and "cause of action" or the reversal of the *Ted Lansing* trial court's *sua sponte* judgment on a wholly different unpleaded ground of warranty with no amended pleading) allege only one written contract. Count III alleged an agreement drawn in early 1998 signed by both parties and by which they allegedly settled their litigation. We find this is sufficient for notice pleading. Nowhere is there any pleading, discovery response, deposition, proffered fact, inference of fact, remote speculation, or innuendo that there was more than one such *written* contract. When the written contract was first alleged in Count III of the amended Cross-Bill filed on December 17, 2002, it would have been time barred had it been an oral agreement. In fact, as plaintiff has correctly argued, Count V was just about to suffer such fate for defendant's failure to produce the original document as ordered by the Court. Count V is a reallegation of the same written agreement alleged in Count III. Although the plaintiff denies having any agreement, she has repeatedly stated in her own pleadings and motions that any claim based on the written document alleged can mean no more or no less than what is contained in the agreement itself. We agree. As stated in *Dillow*, Count V relates back if it arose out of "the same transaction, act, agreement, or allegations, however great may be the difference in the form of liability as contained in the amended from that stated in the original declaration, it will not be regarded as a new cause of action." The Court finds that Count V arose out of the same conduct transaction, or occurrence set forth in Count III. The scope of the claim, as rightly argued by the plaintiff, could in the past and can only now be determined by reading the document.

The Court liberally allows amendments to pleadings. It is no coincidence that § 8.01-6.1 refers to the rule of relating a claim back for the purpose of statutes of limitation as applicable where there is "an *amendment* of a pleading *changing* or *adding* a claim." (Emphasis added.) This Court interprets "change" to include "delete," as in the claim of 1/3 of the plaintiff's estate. The purpose of pleading Count V was to bring the specific factual allegations pleaded in Count III in line with the words in the written document produced. The same properties were pleaded in Count III and Count V as subject to the written agreement, the specific incidents of ownership relating to each property were changed, and an allegation for the omission of a contract provision regarding the 1/3 interest in plaintiff's estate was pleaded. The Court declines to grant the plaintiff's motion to dismiss on the ground that Count V does not relate back and is thus time barred.

B. *Is Count V Barred by the Defendant's Lack of Reasonable Diligence in Pleading the Written Settlement Agreement?*

If the Court should find lack of reasonable diligence in the defendant's asserting the amended claim, then the relation back rule in § 8.01-6.1 would not apply and Count V would be time barred. The Court has already ruled there were timely and sufficiently detailed facts pleaded

to put the plaintiff on notice of the counterclaim of a written settlement agreement. The defendant argues at great length and in great detail of the efforts undertaken by the defendant to find the document. The plaintiff has argued the defendant's constantly changing assertions and excuses for not producing the original document.

The epicenter of all this litigation, including the written document, has been Mr. Kelsoe's effort to obtain 1/3 of the large estate owned by Ms. Holland. The Court, at this point, will only go so far to say that the information produced through discovery or proffered through counsels' representations or adduced by testimony in court or by depositions has been contradictory in the extreme. Without deciding at this time the diligence issue, the Court notes there is a certain moth to the flame quality to this case involving Ms. Holland's marriage to a man twenty-one years her junior. There are vastly different arguments and representations about whether this was a loving marriage or a scam to hit the 1/3 estate jackpot. Some of the facts related to the Court are as bizarre and out of the ordinary as the Court has ever heard. But these matters stand in sharp factual contradiction. Accordingly, the Court following the suggestion of plaintiff's counsel, which the Court deems to be reasonable, will reserve a finding of whether the defendant was reasonably diligent in amending Count III to bring it in compliance with the written document, which, as the plaintiff has pointed out, went missing from April 5, 1988, until just before November 24, 2004. The Court will hear evidence on this issue at trial which necessarily means that the final decision of Count V relating back under § 8.01-6.1 to Count III for purposes of the statute of limitations will remain an open issue until the conclusion of all of the evidence.

Since the plaintiff has conceded that she was not substantially prejudiced in litigating this case on the merits by the amendment to Count III, this matter will not be further discussed here as the Court finds this issue resolved in favor of the defendant.

May 10, 2005

This matter came to be heard on plaintiff Holland's Second Motion for Summary Judgment as to Count V of defendant Kelsoe's Amended Cross-Bill. By Order entered August 7, 2003, this Court declined to grant Holland's Motion for Summary Judgment/Plea in Bar to Count III of Kelsoe's Cross-Bill entitled "Breach of 1999 [sic] Settlement Agreement" which factually alleged a written agreement dated February 1, 1998, between the parties, however, the same order granted Holland's Motion Craving Oyer requiring Kelsoe to produce the original written agreement within sixty days. By Order entered December 9, 2003, this Court found that on November 21, 2003, Kelsoe produced an original two-page handwritten document dated April 5, 1998, which, notwithstanding certain factual discrepancies, was the written contract alleged in Count III. By such Order, Kelsoe was granted

leave to amend Count III (now Count V) to conform Kelsoe's pleadings to reflect the document produced.

Holland argues that Count V should be dismissed because it is estopped by prior inconsistent positions taken by Kelsoe in this litigation. Although not stated in Holland's Second Motion for Summary Judgment or in her Notice of Hearing, Holland's counsel telephoned Kelsoe's counsel the day before the hearing to state that Holland would argue "election of remedies" as an additional ground for her motion. While the Court deemed this inadequate notice, the Court without objection from Kelsoe allowed Holland to include this ground in her argument subject to leave to the parties to file written briefs. Holland also argues that Count V should be dismissed because the 1998 document is purported by Kelsoe to be a settlement of oral contracts alleged under separate counts previously dismissed as barred by the statutes of limitation.

The Court has reviewed the parties' briefs and the authorities cited therein. Although Holland employs various terminologies to describe the basis for the relief she seeks the Court finds there are two legal principles underlying Holland's argument, namely, judicial estoppel and election of remedies.

*Issue*

The issue before the Court is whether, because of judicial estoppel or election of remedies, Kelsoe is precluded from litigating Count V of his Cross-Bill which alleges a contract of settlement dated April 5, 1998, between Kelsoe and Holland.

*Analysis*

I. *Judicial Estoppel*

Virginia case law for over 100 years has recognized judicial estoppel albeit under different names. See *C. & O. v. Rison*, 99 Va. 18, 37 S.E. 320 (1900). It should be noted that the doctrine is distinguishable from *res judicata* and collateral estoppel, not argued here.

*Res judicata* holds that a person cannot litigate a second time with the same person any question, controversy, or issue that has been fully determined upon the merits, by a court of competent jurisdiction, in a former suit. To sustain a plea of *res judicata*, it is necessary to show that the parties are the same, the issue is the same, and the issue has been decided. It is not always necessary that the matter should have been formally put in issue if the issue has been presented and the parties had the opportunity of bringing on evidence and arguments before the Court.

Collateral estoppel is the preclusive effect impacting in a subsequent action based upon a collateral and different cause of action. In the subsequent action, the parties to the first action and their privies are precluded from

litigating any issue of fact actually litigated and essential to a valid and final personal judgment in the first action. *Lofton Ridge, L.L.C. v. Norfolk Southern Ry.*, 268 Va. 377, 601 S.E.2d 648 (2004).

The Virginia Supreme Court has most recently had the occasion to consider judicial estoppel in the case of *Bentley Funding v. SK&R*, 269 Va. 315, 609 S.E.2d 49 (2005). Bentley Funding was a developer. In order to undertake development of land it owned, Bentley had to post cash escrows with the County. The actual cash was put up on behalf of Bentley by an individual, Peter Denger, from his personal funds. Bentley agreed to refund Denger the remainder of any funds not applied by the County. Thereafter, Bentley was placed in involuntary bankruptcy. Bentley deeded the bulk of the land to SK&R, a secured creditor, by a contract approved by the Bankruptcy Court. All creditors were paid in full. The bankruptcy proceeding was concluded. The County issued a check to Bentley refunding a portion of the escrow fund. SK&R then notified the County it was owed the escrows. The County filed an interpleader action in Circuit Court which joined Bentley, SK&R, and Denger. During the pendency of the Circuit Court case, the Bankruptcy Court denied a motion by SK&R to reopen the Bentley bankruptcy to clarify the order approving the contract. The Circuit Court held SK&R was entitled to the escrows because they constituted a "development right" under the bankruptcy approved contract. Bentley and Denger appealed.

Under what the Supreme Court found to be judicial estoppel, SK&R argued that the language of the Bankruptcy Court order confirming the contract for the conveyance from Bentley to SK&R also confirmed that the escrows conveyed because the contract language stated "it [is] the intent of the parties that SK&R receive title to all [Bentley's] interest in the River Oaks property." The Bankruptcy Court in denying the motion to reopen found that the escrows were immaterial to the conclusion of the bankruptcy. Finding that the ownership of the escrows was unnecessary for the resolution of the bankruptcy, the Supreme Court held that no judicial estoppel on the issue of ownership of the escrows could be drawn from the proceedings or orders of the Bankruptcy Court and reversed the trial court's decision. The *Bentley* trial court had been emphatic in finding "it would be a *shame on the bankruptcy court* for this court to find that the erosion control escrows were an asset of Bentley Funding Group, L.L.C." (Emphasis added.) Once judicial estoppel was eliminated, the Supreme Court decided for the appellants by interpretation of the plain meaning of the words on the contract.

Judicial estoppel is an equitable doctrine invoking the discretion of the trial court.

The application of judicial estoppel has not proven susceptible to precise definition and the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general

formulation of principle. *Bentley* citing *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982). The United States Supreme Court in *New Hampshire v. Maine*, 532 U.S. 742, 149 L. Ed. 2d 968, 121 S. Ct. 1808 (2001), recognized the inherent malleability of the doctrine of judicial estoppel. The Virginia Supreme Court in *Bentley* noted that, although *New Hampshire* stated "we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," certain factors must be present in order for the doctrine to apply.

The *Bentley* case, for the first time, spelled out a standard of review for judicial estoppel in Virginia. In doing so, it undertook examination of the decisions in *Jaffe v. Accredited Surety & Cas. Co.*, 294 F.3d 584 (4th Cir. 2002), and *New Hampshire*.

*Bentley* found the elements for claim preclusion by judicial estoppel to be:

(1) The party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation which position must be one of fact rather than law or legal theory;

(2) The parties to the disparate proceedings must be the same;

(3) The party sought to be estopped must have succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.

A fourth element was stated, but, because its consideration was found to be unnecessary for the court's decision, the Supreme Court declined to decide if it was an element or not. The fourth element was stated to be:

(4) The party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

There is no question that the second element of judicial estoppel is met because Kelsoe and Holland have been the only parties involved throughout all our litigation.

Even if this Court were to accept in our present case that Kelsoe has made an inconsistent claim of fact satisfying the first element of judicial estoppel, there remains the critical determination of whether the dismissal of prior counts on the statutes of limitation has created the perception of a fraud on the court. As stated in *Bentley*, citing *New Hampshire*, "absent success in a prior proceeding, a party's later inconsistent position introduces

no risk of inconsistent court determinations, and thus poses little threat to judicial integrity."

Under current Virginia practice, a plaintiff may plead alternate facts and legal theories or pray alternatively for inconsistent remedies. Va. Code § 8.01-272; Rule 1:4(k).

Applying the third element of judicial estoppel from *Bentley*, it is fundamental to this Court's analysis that, in dismissing Kelsoe's other counts as not timely filed under statutes of limitation, this Court in no way determined that such bars to proceeding precluded the prosecution of an alternate claim of a written settlement agreement denied by Ms. Holland. Mr. Kelsoe testified about the written agreement in 1999 and has pleaded it as a separate claim since 2002. We do not see any possibility of this Court's prior rulings posing a risk of this court or any court reaching a determination which would result in any double recovery or other inequitable disadvantage to Ms. Holland. This Court finds no threat posed to judicial integrity.

Moreover, assuming Virginia would apply the fourth element, this Court finds that our case has been mutually delayed and dragged out by both parties for nine years and, therefore, Kelsoe would enjoy no unfair advantage and no unfair detriment would result to Holland by virtue of Kelsoe's not being estopped.

The Court refers counsel to this Court's prior opinion letter of July 16, 2003. Any fair reading of the record of our case would show that neither party has pressed this suit forward. It has been a frustrating exercise in fits and starts. There was a Decree of Reference entered April 28, 1999, wherein William Riley Marchant was appointed as a Commissioner in Chancery to hear evidence and report on equitable distribution. He was directed by the orders of Judge Ledbetter to take evidence on two motions. In 1999, Mr. Marchant heard evidence and argument on the motions and filed an interim report. Neither party promptly pursued the motions afterwards. On January 24, 2001, Mr. Marchant, in frustration, returned his fees to the parties because the case seemed dead in the water. Subsequently, the case was to be removed from the court's docket because no order had been entered in two years. It was only after the appearance of Holland's present counsel in July 2002, that the Commissioner's 1999 interim report was brought back before the Court for hearings which took place in 2003.

The application of the doctrine of judicial estoppel must always be considered in light of the cautions stated by the U.S. 4th Circuit in *Lowery*:

> The insistence upon a court having accepted the party's prior inconsistent position ensures that judicial estoppel is applied in 'the narrowest of circumstances. Indeed, the prior success rule narrows the scope of judicial estoppel to the point at which the necessity of protecting judicial integrity outweighs the ramifications of that protection upon the litigant and the judicial system. Because of the harsh results attendant with

precluding a party from asserting a position that would normally be available to the party, judicial estoppel must be applied with caution.

*Lowery v. Stovall,* 92 F.3d 219, 224 (4th Cir. 1996).

No reliance placed by this Court in its dismissal of other claims would preclude proceeding on an alternate theory that such claims may have been subsumed into a settlement agreement.

## II. *Election of Remedies*

This Court believes that this doctrine was correctly analyzed in the decision of Judge Ledbetter in the case of *Keller v. Woods,* 36 Va. Cir. 455 (1995). Judge Ledbetter noted that the purpose of the doctrine is to permit only one satisfaction for one cause of action and to avoid harassment of a defendant by two suits when one would answer all the purposes of justice. As noted by Judge Ledbetter, where separate actions touching the same parties and subject matter are simultaneously pending, the Court, upon proper motion to elect, can compel the plaintiff to decide which action he will prosecute. As in the case before Judge Ledbetter, there was no motion to compel an election made in our case.

After noting as we have stated above, that, in Virginia, parties can plea alternative facts, legal theories, or inconsistent remedies, Judge Ledbetter in *Keller* observed that Keller's pleadings in law and equity were virtually identical, that, at the trial of the first case, Keller presented evidence with respect to voidability, that the Court ruled on such issue and, therefore, the same matter could not be litigated again. Count V in our case is not virtually identical to the claim in any of the dismissed counts. In sustaining Holland's Pleas to the statutes of limitation adversely to Kelsoe, the Court did not preclusively consider or rule on the issues pertaining to Count V.

As to Holland's claim that election of remedies should be imputed to Kelsoe, Judge Ledbetter noted from Professor Bryson's *Handbook on Virginia Civil Procedure* (2d ed. 1989), p. 475, the election is deemed to be made when final judgment is given on the issues raised. While this has been argued by Holland to mean any final judgment, Professor Bryson notes that the concept is the same as that of *res judicata* and that election is imputed to the plaintiff to achieve a just result. In other words, as Judge Ledbetter put it, election of remedies "is a corollary rule" to *res judicata.*

We note again that we are not dealing with *res judicata.* In Holland's Rebuttal Brief, under the section arguing election of remedies, are cited the cases of *Roberts v. Commonwealth,* 48 Va. Cir. 305 (1999); *Cherokee Corp. v. Richardson,* 40 Va. Cir. 162 (1966); *Richardson v. Allstate,* 39 Va. Cir. 549 (1974); and *Keller* cited above. Each of these cases consider election of remedies in situations involving the application of *res judicata* and are thus

distinguishable from our case. We find election of remedies not applicable to our case.

This Court has no disagreement with the application of "merger and bar" in the case of *Noland Corp. v. Holsapple*, 20 Va. Cir. 265 (1990). We do find it material that, in such case, the defendant obligee admitted both the settlement agreement and that he had breached its terms. In our case, Holland denies the agreement or at least its enforceability and has denied any breach. A reading of the alleged settlement agreement seems to leave issues as to what were the mutual considerations and the specifics of the terms allegedly agreed to. We find here that merger and bar if at all different from election of remedies does not preclude Kelsoe's litigation of Count V.

### Conclusion

Judicial estoppel has an extremely narrow scope and must be applied with caution. This Court finds that the imposition of such doctrine is not justified in our case. This Court also finds that election of remedies is not applicable in our case. We hold that neither the doctrine of judicial estoppel nor election of remedies precludes Kelsoe from litigation of his claim based on the alleged 1998 contract.

### May 11, 2005

The purpose of this letter is to address several loose ends in this case.

(1) This Court has denied Holland's most recent Motion for Summary Judgment.

(2) Kelsoe has filed a Motion for Partial Summary Judgment with a brief in support. There has been no notice filed by Kelsoe setting this motion for hearing. The Court granted counsel the right to brief Ms. Holland's Motion for Summary Judgment. Would not the same be allowed for Kelsoe's Motion? Mr. Bugg has made an objection in his letter of May 5, 2005.

(3) Assuming that the trial goes forward as scheduled, the Court has no objection to bifurcating the issue of determination of whether there is a binding legal contract from the issue of damages, if necessary, at a later date. We now have a one day trial scheduled May 19, 2005.

Notwithstanding the long history of this case, it seems we are not near a final resolution. If the Court finds there is a legally binding contract, we will have to have another hearing on damages. If the Court finds no valid contract, there remains the issue of equitable distribution reserved in the divorce decree. The parties need to be rid of each other. Mediation, pre-trial conference, or other alternate means of dispute resolution (devoid of pejorative characterizations) seem to be unexplored avenues.

 

May 1, 2013

This letter reconsiders the Court's oral ruling from the bench on May 19, 2005. The subject of the hearing was a handwritten agreement dated April 5, 1998, signed by the parties. At the conclusion of this hearing late in the evening, the Court, unable to come to any clear understanding of the agreement, ordered specific performance of provisions for the conveyance of two parcels of land located in Virginia containing 91½ acres and 10 acres, respectively, and a tract of land located in Semmes, Alabama, known as the Rose Garden property, but also found the other provisions in the agreement not to be clear enough for the Court to order specific performance. Kelsoe's counsel was to prepare the Order.

At a subsequent hearing on August 29, 2005, the Court was informed by counsel that the parties could not agree on an Order to such ruling. The Court was also informed that day that Kelsoe had filed a Motion for Partial Reconsideration of the Court's ruling. Upon consideration of this and in the interest of fairness, the Court declined to enter any Order and gave leave to Holland to file her own Motion for Reconsideration. The parties briefed their positions, and the Court on December 20, 2005, heard oral arguments.

By way of general background, the parties were married on February 1, 1994. Holland is twenty-one years older than Kelsoe. They separated two years later. Shortly thereafter Holland brought this suit for divorce. The widow of a successful lumberman and businessman, Holland is very wealthy. Holland was granted a final divorce on December 4, 2002. Kelsoe's position from the start has been that, as a part of their marriage, Holland promised him he would get one-third of her estate.

### Reconsideration

The Court in this letter reconsiders whether Count III of the Second Amended Cross-Bill filed December 17, 2002, adequately alleged the April 5, 1998, settlement agreement sufficiently to survive a limitations challenge on its own and whether Count V of the Third Amended Cross-Bill should be dismissed based on Kelsoe's failure to demonstrate due diligence pursuant to § 8.01-6.1.

The following timeline relates the sequence of events relative to this consideration:

February 1, 1998: In the Commissioner's hearing on August 26, 1999, Kelsoe testifies, and, in Count III of his Cross-Bill filed December 17, 2002, Kelsoe alleges he and Holland entered into a February 1, 1998, handwritten settlement agreement pursuant to which he would receive one-third of her estate.

April 5, 1998: Kelsoe, on November 21, 2003, discovers the original April 5, 1998, handwritten settlement agreement with Holland by which he does not get one-third of her estate. He produces this document before the

Court on November 24, 2003. He testifies this is the agreement he thought was dated February 1, 1998. Kelsoe testifies he lost his copy of April 5, 1998, document; Holland had the original, but hid it; and he discovered the original when a vision of his deceased father appeared before him and told him where it was.

August 26, 1999: In a hearing before Commissioner in Chancery W. Reilly Marchant, Kelsoe, under oath, testifies in detail about the February 1, 1998, written settlement agreement.

August 19, 2002: Kelsoe's then attorney, Harry Cohn, makes a detailed proffer to the Court that Kelsoe can prove that Holland has committed fraud on the Court by secreting and hiding the original settlement agreement.

December 4, 2002: The Court grants Holland a final decree of divorce reserving only equitable distribution. This eliminated the possibility Kelsoe could attain one-third of the estate by simply outliving Holland.

December 17, 2002: Kelsoe files the Second Amended Cross-Bill, which, in Count III, raises for the first time the written settlement agreement dated February 1, 1998, pursuant to which Holland is to place one-third of her estate in an irrevocable trust to go to Kelsoe at her death.

February 1, 2003: The five year statute of limitations on February 1, 1998, agreement runs.

April 5, 2003: The five year statute of limitations on April 5, 1998, agreement runs.

July 16, 2003: The Court's opinion letter declines Holland's Motion to Dismiss Count III, finding it would relate back, assuming a written document dated February 1, 1998, is produced or otherwise found by competent evidence to exist and its terms precisely establish the claim. Also, Holland's Motion Craving Oyer is granted, and Kelsoe is to produce the original written document for Holland and the Court within sixty days.

August 7, 2003: A court order dismisses all counts in Kelsoe's Second Amended Cross-Bill except Count III. The Court takes under advisement Holland's Motion to Dismiss but, pursuant to the Motion Craving Oyer, orders Kelsoe to produce the original written document within sixty days.

October 6, 2003: The sixty days for producing the original written document expires.

November 21, 2003: Kelsoe discovers the April 5, 1998, written settlement agreement when vision of his dead father tells him where it is.

November 24, 2003: In Court, Kelsoe produces for the first time the April 5, 1998, written settlement agreement.

December 11, 2003: By leave of Court, Kelsoe files the Third Amended Cross-Bill, adding Count V, alleging the April 5, 1998, written settlement agreement.

September 9, 2004: The Court's opinion letter, Part A, declines to grant Holland's Motion to Dismiss Count V on grounds that it does not relate back and is time barred, but this ruling is subject to Part B on the issue

of whether Kelsoe failed to exercise reasonable diligence by not bringing Count III on the Agreement produced on November 24, 2003 (over 5½ years after April 5, 1998). The Court reserves this issue for an evidentiary trial, finding that the statute of limitations on relation back under § 8.01-6.1 will remain an open issue until the conclusion of all of the evidence.

May 10, 2005: In the Court's opinion letter, Court declines to impose the judicial estoppel doctrine and finds election of remedies not applicable to the case. This letter does not address the reserved issue of Kelsoe's reasonable diligence, nor had the Court, as provided in its September 9, 2004, opinion letter, availed itself of hearing evidence at a trial. A hearing was scheduled May 19, 2005.

May 19, 2005: The Court hears testimony and issues a ruling from bench. The Court discussed § 8.01-6.1, including reasonable due diligence on the part of Kelsoe. The Court commented that Kelsoe's testimony of the timing and circumstances of finding the April 5, 1998, agreement were suspicious and that he had a strong motive not to locate the agreement because it would destroy the last remnant of his claim to one-third of Holland's estate. The Court omitted in its opinion from the bench a specific ruling on whether Count III adequately alleged for the purposes of § 8.01-6.1(i) the April 5, 1998, agreement and whether Kelsoe's allegation in Count V should under § 8.01-6.1(ii) be dismissed for Kelsoe's failure to exercise reasonable diligence in alleging the April 5, 1998, agreement. This ruling is specifically reconsidered in this opinion letter.

## Analysis

Although not as clear as it should have been, the Court in its prior opinions reserved until after the evidentiary hearing determination of whether, under § 8.01-6.1(i), the amended claim in Count V arose out of the conduct, transaction, or occurrence set forth in Count III and whether, under § 8.01-6.1(ii), Kelsoe was reasonably diligent in asserting his claims based on the April 5, 1998, agreement. Holland argues that Count III in the Second Amended Cross-Bill alleged a completely different contract from the agreement dated April 5, 1998, that Kelsoe produced on November 24, 2003, and pleaded in Count V of his Third Amended Cross-Bill. She also argues that Kelsoe was not reasonably diligent because he did not produce the April 5, 1998, document until after the sixty days ordered by the Court had expired and 5½ years had elapsed since the date of such agreement.

In Part A of its opinion letter of September 9, 2004, the Court, after a long review of case law on the relation back rule, concluded that because only "one such *written* contract" (emphasis original) was implicated in the pleadings, the April 5, 1998, agreement alleged in Count V arose from the same conduct, transaction or occurrence alleged in Count III. However, in Part B of the same Analysis, the Court reserved consideration of Kelsoe's "reasonable diligence" in production of the same April 5, 1998, agreement,

stating "the Court will hear evidence on this issue at trial which necessarily means that final decision of Count V relating back to § 8.01-6.1 to Count III for purposes of the statute of limitations will remain an open issue until the conclusion of all of the evidence." For clarification, the Court then, as it does now, meant that both elements (i) and (ii) under § 8.01-6.1 were reserved for later ruling. The Court's concern was Kelsoe's credibility. The premise was that there were not two written contracts dated February 1, 1998, and April 5, 1998, and that Kelsoe was innocently confused about the precise terms in one written settlement agreement. The issue to the Court was whether, in Count III, Kelsoe deliberately and knowingly alleged a non-existent settlement agreement with a non-existent provision giving him one-third of Holland's estate.

In its opinion letter dated May 10, 2005, the Court overruled Holland's claims that Count V should be dismissed on the grounds of judicial estoppel or election of remedies. This opinion did not affect the Court's reservation of determination of the relation back rule under § 8.01-6.1 and the due diligence of Kelsoe as it related to the allegations of agreements contained in Count III and Count V.

"Reasonable diligence" has been defined as "[a] fair, proper, and due degree of care and activity, measured with reference to the particular circumstances; such diligence, care, or attention as might be expected from a man of ordinary prudence and activity." *Black's Law Dictionary*, Fourth Edition, p. 544, citing *Ford v. Engleman*, 118 Va. 89, 86 S.E. 852 (1915). Inherently included in this definition is the truth and honesty required in good faith pleading, proffers to the Court, and in sworn testimony.

The crux of Kelsoe's case was his claim to one-third of Holland's estate. Kelsoe always claimed that Holland had the original written settlement agreement and had hid it so he could not get the one-third he sought.

Kelsoe testified before Commissioner in Chancery W. Reilly Marchant on August 26, 1999. The transcript of that hearing contains detailed testimony by Kelsoe concerning the time and circumstances under which the agreement was written and the labors he had undertaken to find the original agreement, which, according to Kelsoe, Holland possessed. He testified that the agreement was written on "old [computer] track type paper that nobody uses anymore, the green and white, da da da; you know what it is." (CCT, p. 416, ll. 8 & 9.) Further, he testified he knew the agreement was dated February 1, 1998, because "[i]t was my birthday. That was the day we got married and that was a significant date to her to say, okay, this is a good day, this is our anniversary, da da da." (CCT, p. 422, ll. 20-23.) Questioned about the trust for a third of Holland's estate, Kelsoe testified that Holland said "we'll go ahead and put the one-third [of her entire estate] at the bottom, and we'll put it on and so that, if I pass or something happens, you got it and that's it," to which he replied "then let's sign it, let's date it. We did." (CCT, p. 417, ll. 12-16.) Kelsoe testified he got a

copy of the handwritten agreement (CCT, p. 419, ll. 22-25) and "put . . . it in my desk in my house at Millers Tavern" but later he could not find it and that the only person having access to the house was "Myrtle." (CCT, p. 420, ll. 1-7.) Judge Ledbetter had allowed Kelsoe earlier to search through Myrtle's papers to find the original agreement which Kelsoe said still could not be found. Holland argues this is conclusive proof by Kelsoe's own testimony that Count III alleged a separate February 1, 1998, agreement in which Kelsoe would get one-third of Holland's estate, not to the April 5, 1998, agreement in which he would not. The Court concurs that Count III describes a separate contract, separate in time and in its terms, that does not sufficiently describe the April 5, 1998, agreement for purposes of it relating back as arising from the same conduct, transaction, or occurrence for the purposes of § 8.01-6.1(i).

Almost exactly three years after the Commissioner's hearing before Mr. Marchant, there was a hearing in this Court on August 19, 2002. On pages 31 through 43 of the transcript of such hearing, Kelsoe's then attorney, Harry Cohn, stated to the Court that Kelsoe had been trying to get from Holland a written contract that memorialized an ongoing oral contract. Mr. Cohn explained that, pursuant to an Order entered by Judge Ledbetter, Kelsoe was given free access to Holland's office to search for the written agreement. Mr. Cohn went on further to say "I have learned recently that there was a series of documents that were secreted away, preventing my client from getting access to, and we firmly believe those documents were intentionally hidden, and we are going to depose someone who is going to testify under oath that they were told by Mrs. Kelsoe that she intentionally took boxes of documents and hid them in a van and hid the van in the barn on the day that Mr. Kelsoe was ordered into this office to locate these documents." (8/19/02 T., p. 32, l. 25, through p. 33, l. 11.) Cohn continued "we are going to put on evidence, Judge, that is going to, I hope by clear and convincing evidence, demonstrate to the Court that there has been basically a fraud perpetrated on this Court by the intentional hiding of documents that would have led this case to a quick resolution" (T., p. 37, ll. 11-17); and that, "if that happens, not only can we retrieve the written contract, which is going to take it into a five year period and then we can amend because I think it relates back." (T., p. 37, ll. 21-25.) Putting a finer point on it still, Cohn stated: "I think it is a travesty that it is happened, and I am convinced that I am being told very candidly from a person who is prepared to go under oath and testify to that." (T., p. 38, ll. 12-15.) These statements by Kelsoe's counsel show that, in August, 2002, Kelsoe claimed that Holland was fraudulently hiding and refusing to produce the original written document.

It was later revealed to the Court that the witness referred to by Mr. Cohn was Bill Cullum. But when deposed, Cullum said he knew nothing about this scheme. Notwithstanding the explicit detail that Cohn had given,

Kelsoe blamed Cohn for having misunderstood what the evidence was. The degree of detail in the statements of Cohn are remarkably similar to those of Kelsoe at the Commissioner's hearing. Thereafter, Cohn withdrew as Kelsoe's counsel. Kelsoe then hired Ms. Washington as his attorney.

On December 4, 2002, the Court entered the final decree of divorce. This event eliminated the possibility Kelsoe could attain one-third of the estate by simply outliving Holland. Just thirteen days later, Kelsoe filed his Second Amended Cross-Bill alleging for the first time in Count III breach of the February 1, 1998, settlement agreement which provided that Holland would place one-third of her estate in an irrevocable trust to go to Kelsoe at her death. The filing of this Cross-Bill was just six weeks before the five year statute of limitations would have run on February 1, 2003. The document alleged had, of course, not been produced, and Kelsoe still claimed Holland had it. There were also in the Second Amended Cross-Bill, two counts of oral agreements each claiming one-third of Holland's estate and one count of fraud for money damages. Had the April 5, 1998, agreement been produced, it would have knocked out all the other counts. In the Court's opinion letter of July 16, 2003, and its Order entered August 7, 2003, the Court dismissed all of the counts in Kelsoe's Second Amended Cross-Bill except Count III and took under advisement Holland's Motion to Dismiss, while ordering Kelsoe to produce the written document to the Court within sixty days which Kelsoe failed to do. Several days before the hearing scheduled on November 24, 2003, facing almost certain dismissal of Count III, the only claim he had left for one-third of Holland's estate, Kelsoe called his counsel and informed him he had found the agreement.

Kelsoe, on November 24, 2003, produced, of course, not an agreement dated February 1, 1998, but the agreement dated April 5, 1998. The explanation given by Kelsoe about the discovery has been characterized by this Court more than once as "suspicious." The explanation was worse than that. It was incredulous to the point of being completely unbelievable. Kelsoe testified that, just a few days before the hearing, his deceased father, who was part Cherokee, appeared in a vision and revealed to him the location of the written document. The revelation which came from the vision was that this document was in the papers of Kelsoe's dead brother in Alabama in a box of papers under a bed. Moreover, it was not Kelsoe's lost copy, but the original document. Holland argues this to be inherently incredible. Kelsoe responded that Holland was attempting "to belittle [Kelsoe's] described religious experience." Kelsoe's counsel argued the Court should not be swayed "contrarily to common sense" by Holland's argument and further argued that, while the discovery culminated Kelsoe's more than 5½ year search for the original document, the lateness of the discovery should not in any way adversely reflect on the great reasonable diligence Kelsoe used in his search. Lastly, Kelsoe's counsel said that Holland's "unfortunate attempt"

to attack Kelsoe's credibility should not be persuasive to the Court because it was based solely on "the unconventionality of his religious beliefs."

Kelsoe himself has offered no credible explanation for the discovery. The father vision that appeared to Kelsoe cannot be questioned about the April 5, 1998, agreement or the means by which the original got to be where it was, contrary to Kelsoe's representations from 1999 through November 21, 2003. This is not about anyone's religious beliefs. It is the duty of the Court as the trier of fact to determine the credibility and weight to be given to the evidence. Based on the record before it, the Court simply does not believe Kelsoe. He cannot show reasonable diligence in pleading the April 5, 1998, settlement agreement in Count V.

The person who secreted and hid the settlement agreement was not Holland, but Kelsoe. The document was not hidden by Holland because it would give away one-third of her estate; it was hidden by Kelsoe because it would not give away one-third of her estate. Kelsoe's multiple claims seeking one-third of Holland's estate would all be for naught if there existed a settlement agreement without a provision for Kelsoe receiving such share. Based on Kelsoe's persistence, the Court finds it incredible that he would not correctly recall the provisions in the settlement agreement pertaining to his receiving one-third of Holland's estate. Bit by bit, things fell away until Kelsoe had no recourse but to resort to the fabrication of a vision revealing the location of the document. Kelsoe had a motive and a self-interest in the written settlement agreement never seeing the light of day.

The Court finds that Kelsoe did not act truthfully or honestly in asserting the settlement agreement alleged in Count III and did not act with reasonable diligence in producing the April 5, 1998, settlement agreement, which he intentionally held undisclosed in his sole possession until after the sixty day production deadline imposed by the Court expired and after more than 5½ years had elapsed and the five year statute of limitations had run. To reveal the April 5, 1998, settlement agreement ran contrary to his self-interest, but, in the end, his options ran out. The Court finds that the April 5, 1998, settlement agreement pleaded in Count V does not relate back to the same agreement pleaded in Count III.

### Conclusion

The April 5, 1998, settlement agreement is not adequately alleged in Count III and hence is barred by the five year Statute of Limitations. Kelsoe did not act with reasonable diligence pursuant to the April 5, 1998, settlement agreement in Count V, and it is likewise barred.